**Frank J. SCHWARTZ and Chicago Power Management, Inc., Plaintiffs and Counterdefendants,**

v.

**MICHIGAN POWER MANAGEMENT COMPANY, Defendant and Counterplaintiff.**

**No. 81C7069.**

United States District Court, N.D. Illinois, E.D.

April 7, 1983.

John J. Toomey, Arnold & Kadjan, Chicago, Ill., for plaintiffs and counterdefendants.

Jacob Pomeranz, Cornfield & Feldman, Chicago, Ill., for defendant and counterplaintiff.

MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Chicago Power Management, Inc. and its major principal Frank J. Schwartz[1] bring this diversity action against Michigan Power Management Company ("Michigan Power"). Schwartz's three-count Second Amended Complaint (the "Complaint") focuses on Michigan Power's asserted failure to obtain the approval of Underwriters

---

1. For convenience plaintiffs are hereafter collectively termed "Schwartz," taking a singular verb.

Laboratories, Inc. ("UL"), a standard testing laboratory, for the electrical power management systems Schwartz purchased pursuant to a "Dealer Agreement" (the "Agreement") with Michigan Power:

    1.  Count I claims UL approval was an unsatisfied condition precedent to the Agreement.

    2.  Count II asserts Michigan Power breached the Agreement by failing to secure UL approval and to offer Schwartz its new products under the Agreement's right of first refusal provision.

    3.  Count III charges Michigan Power induced Schwartz to enter into the Agreement through various misrepresentations, including its statement that UL approval would be procured for all its present products.[2]

In turn, Michigan Power has filed a counterclaim, asserting Schwartz's failure to perform his Agreement undertakings.

Schwartz has filed two summary judgment motions under Fed.R.Civ.P. ("Rule") 56, one as to all three Complaint counts and the other as to the counterclaim. For the reasons stated in this memorandum opinion and order, both motions are denied.

### Facts[3]

On August 10, 1980 Michigan Power placed an ad in Chicago newspapers, offering to sell energy management electrical equipment. In response to the ad Schwartz called Michigan Power for further details. Michigan Power then mailed Schwartz some brochures describing the equipment.

Over the next several days Schwartz explored with Michigan Power President Carson B. Ashworth ("Ashworth") the possibility of serving as Michigan Power's dealer in the Chicago territory. During the negotiations Schwartz asked whether Michigan Power's energy systems had been listed by UL. Ashworth qualified his "no" answer by saying Michigan Power had already initiated and would continue to pursue the UL listing process. Ashworth Dep. 10.

On August 21, 1980 Schwartz and Ashworth signed the four-section Agreement at Michigan Power's office in Michigan (Agreement's provisions are cited "Section —" in this opinion):

    1.  Section I appointed Schwartz as Michigan Power's exclusive Chicago-area[4] dealer "for the purpose of selling the MPM–8000 Power Management Systems" (the "Systems").

    2.  Section II called for the sale of 50 Systems.

    3.  Section III identified the various kinds of assistance Michigan Power was to provide Schwartz.

    4.  Section IV primarily specified Schwartz's responsibilities and rights:

        (a)  Section IV(1) obligated Schwartz to "advertise, promote, and sell the . . . MPM–8000 Power Management Systems in his exclusive territories."

        (b)  Section IV(2) required Schwartz to "[h]ire and train salesmen to sell the manufacturers [sic] energy systems."

        (c)  Section IV(5)[5] obligated Schwartz to order another 20 Systems

---

2. Count III also alleges these other misrepresentations by Michigan Power:

    1.  It manufactured the energy management systems. Complaint ¶ 25(a).

    2.  It was the parent of IBN Research and Development Co. ("IBN"), the true manufacturer. Complaint ¶ 25(b).

    3.  Its own installers and electricians would be available to assist Schwartz. Complaint ¶ 25(c) (alleging such personnel were in fact employees of Benjamin Electric).

    4.  It would furnish to Schwartz a list of installations using its energy management systems.

    5.  It had hundreds of installations in the Chicagoland area. Complaint ¶ 25(d) (alleg-

ing Michigan Power really had no such installations).

3. For Rule 56 purposes, this factual account reflects (1) the uncontroverted portions of the depositions and documents tendered by both sides and (2) any reasonable inferences favorable to Michigan Power. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962).

4. Schwartz's territory embraced four Illinois counties: Cook, DuPage, Lake and Will.

5. Sections IV(3) and (4) are irrelevant to the current issues and require no discussion.

within one year after the Agreement's effective date. If Schwartz failed to do so, Michigan Power could appoint another dealer in the territories.

(d) Section IV(6), the interpretation of which is debated vigorously by the parties,[6] reads:

It is expressly understood that U.L. (Underwriters Laboratory) approval is in process and manufacturer is responsible for any and all modifications (at their [sic] expense) required to obtain and maintain such approval on all present and future power management systems manufactured by MPM to be marketed in the Chicago territory.

(e) Section IV(7) entitles Schwartz to sell any of Michigan Power's "new energy savings products" marketed in the "commercial business marketplace." It also confers on Schwartz the right of first refusal as to any other new Michigan Power product.

(f) Section IV(8) schedules prompt payment for the first 50 Systems: (1) an immediate down payment of $20,-000; (2) an additional $23,000 on or before August 28, 1980; and (3) the balance the week of September 15, 1980—the time contemplated for shipment of the goods.

(g) Section IV(9) called for F.O.B. delivery from Michigan Power's factory in Anchorville, Michigan, requiring Schwartz to reimburse Michigan Power for its freight prepayments.

Initial relations between the parties proceeded smoothly. Schwartz paid the last installment by September 20, 1980, when the 50 Systems were shipped to him. Though some sets were apparently damaged in transit, Michigan Power promptly repaired them to Schwartz's satisfaction.[7]

But the honeymoon ended abruptly when Michigan Power began to experience difficulties in obtaining UL certification. Schwartz and Michigan Power hotly contest

the extent to which the absence of UL approval hampered Schwartz's efforts to market the Systems. Electrical codes of the various political divisions in Schwartz's Chicago territory generally prohibit the installation of electrical appliances (such as the System) that lack approval by UL, any other nationally recognized testing laboratory *or* the governmental unit's own electrical department. While not mandated by any jurisdiction, UL listing may operate in practice as an absolute marketing prerequisite. That however is a factual issue that need not be confronted at this juncture.

Michigan Power's exceedingly frustrating quest for UL certification is chronicled at length in the Ashworth and Martin depositions and their accompanying exhibits—voluminous correspondence between Michigan Power and UL and between Michigan Power and IBN, manufacturer of the System. Only the significant developments in the ongoing saga (enough to negate summary judgment) will be touched on here:

1. On August 6, 1980 (before running the newspaper advertisement that attracted Schwartz's attention) Michigan Power General Manager John R. Schoenbeck ("Schoenbeck") telephoned a UL representative, apprising him of Michigan Power's interest in securing UL listing of the System. In an August 8 follow-up letter, Schoenbeck requested a UL application form. Ashworth Dep.Ex. 1.

2. Michigan Power promptly forwarded the completed application and a sample System, which UL received September 23 and October 24, respectively. Ashworth Dep.Ex. 7, 12.

3. In a November 26 letter to Schoenbeck, UL project engineer Cecil L. Norman ("Norman") acknowledged the sample had passed the heating tests. But he also indicated the System would have to be modified in certain respects, the most important of which entailed adapting the unit's step-

---

6. Though all other Agreement provisions were taken from Michigan Power's standardized dealer contract, the parties disagree as to which side authored Section IV(6).

7. Shortly after the Agreement was consummated, Schwartz formed plaintiff Chicago Power Management, Inc. through which he intended to perform his Agreement responsibilities.

down transformer to conform to UL's Class 2 specifications. Ashworth Dep.Ex. 13.

4. Schoenbeck immediately wrote to IBN engineer Michael Martin ("Martin"),[8] asking him to make the required changes as soon as possible. Ashworth Dep.Ex. 14. Then Ashworth himself gave Martin written authorization to perform the modifications, insisting on expeditious action. Ashworth Dep.Ex. 15.

5. By mid-December Michigan Power had completed every required alteration but one: installation of a Class 2 transformer that was either UL-listed or capable of meeting UL's standards. As to that remaining obstacle to UL approval, Michigan Power found itself ensnarled in a catch-22 position, as an exasperated Schoenbeck pointed out to Norman in a December 18 letter (Ashworth Dep.Ex. 16, copied verbatim):

> I must admit that I am in a quandry of sorts, as I.B.N. Research & Development informs me that there isn't a current U.L. listed Class II transformer available anywhere! In addition, if one were to be found, it wouldn't meet U.L. specifications anymore. This is due to a recent correspondence you had with the manufacturer and told him that the specs for evaluation on Class II transformers were going to be changed anyway. Thus, any model sent with a transformer meeting specification would be held up because the new specifications have not been written.

6. Over the next two months Michigan Power and IBN searched frantically for a UL-sanctioned Class 2 transformer, but to no avail. In a February 24, 1981 letter Schoenbeck informed Norman the "step down transformer recognized for Class II specifications is unattainable for our unit requirements." Ashworth Dep.Ex. 21.[9] Unwilling to concede defeat, however, Schoenbeck suggested the use of a UL-listed Edwards 88 series transformer ("Edwards 88 transformer"), which had greater power capabilities. Ashworth Dep.Ex. 21.

7. Norman was unenthusiastic as to that alternative. In a March 5 letter he indicated the use of such a transformer would necessitate wholesale changes in the design of the System's terminal (Ashworth Dep.Ex. 22, copied verbatim):

> This is in reply to your letter of February 24, 1981. The Edwards 88 Series transformer is Listed as a power transformer. If such a transformer is employed, we are unable to waive the requirements for the terminal construction and spacings. The requirements for the terminal construction may be found in Par. 13.11 through 13.17 of our UL873 Standard. The spacing requirements are those found in Table 26.1 of the UL873 Standard. Also, the unit will need to be marked to indicate that all wiring connections must be Class 1.
>
> We hope these comments will be of some help to you in making the necessary corrections to your unit in order that you may provide us with a revised unit. We will continue to hold this Project on an inactive status for three weeks from the date of this letter.

8. Michigan Power apparently discarded the Edwards 88 alternative, perhaps because the required changes were technically infeasible or because UL never gave Michigan Power the specifications for the necessary changes. Ashworth Dep. 24.[10] Throughout the summer and fall of 1981 Michigan Power resumed its search for a suitable Class 2 transformer. At the rec-

---

8. At the very outset Martin had warned Carson UL certification would probably not be forthcoming. Martin's pessimism was based on (1) "horror stories" about ill-fated attempts to gain UL approval of complex mechanisms (such as the System) and (2) the absence of any UL guidelines for energy management equipment. Martin Dep. 10, 32. Of course Martin's qualms have no bearing on the adequacy of Michigan Power's efforts to acquire UL listing (though they would be relevant if Michigan Power's representations were as Schwartz claims).

9. Schoenbeck was probably referring to the inability of a UL-listed Class 2 transformer to handle enough power to operate the System. See Martin Dep. 15.

10. Neither side has proffered any significant evidence on this score.

ommendation of UL engineer Yertz (who temporarily replaced Norman on the System project), Michigan Power redesigned the System so that two UL-listed Class 2 transformers (apparently Michigan Power had finally found a real—though smaller—live one) could be substituted for the large transformer originally incorporated in the unit. But that possible solution was scuttled when Norman returned to the project. Ashworth Dep.Ex. 37 at 2.

9. Sometime in August UL further compounded Michigan Power's problems by identifying other potential deficiencies, those relating to System's fuses and paneling. Undaunted, Michigan Power sought to address each successive problem perceived by UL.[11] Martin Dep. 13; Fritz Dep. 10.

10. UL's December 10, 1981 letter announced its final test results. It found the System had performed unacceptably in several different tests, and it therefore refused to list the product. Michigan Power was justifiably enraged by UL's decision for at least three reasons:

(a) UL had evaluated the System under proposed UL standards drafted only a month earlier, despite its previously having acquiesced in Michigan Power's efforts to conform the System to the prevailing UL standards.

(b) Most of the tests that produced unsatisfactory results could have been—but were not—performed back in November 1980.

(c) Only one test was given on both occasions—the flammability test—and that yielded inconsistent results: System's flammability was first found acceptable, then unacceptable.

11. Like Sisyphus, Michigan Power again pushed up the UL hill by resubmitting a revised version of the System sometime during the first few months of 1982. Ashworth Dep.Ex. 40.

12. No UL-Michigan Power correspondence has been furnished this Court to illuminate what happened during the remaining months of 1982. What scanty evidence is available suggests Michigan Power continued to alter the System to comport with UL's new Class 2 specifications. Ashworth Dep. 34. In addition a February 2, 1983 letter from UL to Michigan Power—the only recent correspondence included in the record—confirms Michigan Power is bloody but unbowed in its UL certification battle.[12]

In sum the evidence (construed in the light most favorable to Michigan Power) establishes that Michigan Power:

1. sought UL listing for the System aggressively and in good faith;

2. performed in a timely manner every modification requested by UL; and

3. defrayed all expenses incident to the listing process.

That forms the context in which Schwartz's summary judgment motions must be assayed.

*Summary Judgment on the Complaint*

In his almost impenetrable memoranda Schwartz advances five grounds for summary judgment, all of which supposedly establish Michigan Power's unconditional promise of UL listing.[13] Each of the first three contentions predicates that obligation on Section IV(6), characterizing it alternatively as a condition precedent, contractual duty and express warranty. Schwartz's

---

**11.** UL's inability to identify all System problems in a reasonably short time period stemmed from its lack of an overall specification for energy management equipment. Martin Dep. 13, 32. Indeed, it appears UL treated the System project as an opportunity to develop such guidelines—the very ones used in withholding UL approval from the System. Ashworth Dep.Ex. 37 at 2; Martin Dep. 32.

**12.** At some point during 1982 Michigan Power and IBN had a falling out. Since that time Michigan Power has relied on other manufac-

turers to revamp the System to UL's specifications. Martin Dep.Ex. 44(a) at 2.

**13.** Though Schwartz's motion asks for summary judgment on all three counts, none of his five theories of recovery relates directly to Count III. Schwartz's slighting of Count III is unsurprising, for that claim not only flies in the face of Section IV(6)'s plain meaning but also is unsupported by any uncountered evidence that Michigan Power representatives guaranteed UL approval during negotiations with Schwartz.

last two arguments invoke implied warranty theories of merchantability and fitness for the particular purpose.[14] All five assertions are wholly unconvincing for summary judgment purposes, regardless of whether Michigan or Illinois law supplies the rule for decision.[15]

■ All three contract theories of recovery rest on a reading of Section IV(6) that, though possible, is scarcely compelled by its language. Whatever canons of contract interpretation are employed, that provision simply cannot be contorted into an unqualified guaranty of UL certification. It is at least ambiguous in that respect.[16] And if Schwartz drafted Section IV(6) (as Ashworth testified), any arguable ambiguity would have to be resolved against Schwartz.[17]

Under the circumstances, it is surely a permissible reading of Section IV(6) that it merely (1) affirms Michigan Power's representation that the UL listing process had been initiated and (2) obligates Michigan Power to perform any modification needed to secure UL approval. When viewed in the light most favorable to Michigan Power, the record plainly confirms both the validity of Michigan Power's representation and its good faith and timely efforts to conform

the System to UL specifications. So much, then, for Schwartz's breach of contract claims.

■ As for Schwartz's implied warranty theories, both rest on a bizarre proposition: Because the System cannot be marketed in the Chicagoland area (the supposed "ordinary purpose" for which Schwartz purchased the product) without UL certification, Michigan Power impliedly warranted the System would pass UL inspection. That argument is marred by numerous flaws:

1. Neither species of implied warranty directly guarantees extrinsic conditions (such as UL approval) conducive to the marketability of the goods. Both warranty concepts extend only to the goods' intrinsic quality, ensuring their fitness for either their "ordinary purposes" (UCC § 2–314(2)) or the buyer's "particular purpose" (UCC § 2–315). In either case the term "purpose" refers to the product's end use. Concededly Schwartz intended his purchased Systems to be used for their ordinary purpose—energy management. And Schwartz has never demonstrated (or even alleged) that any of his 50 Systems was deficient in those terms.[18]

---

**14.** Schwartz's Complaint did not allude to any of the express and implied warranty claims. Nevertheless, to obviate the prospect of repleading, this Court will entertain those impoverished arguments.

**15.** It is unnecessary to address choice of law problems, for this is not a "true conflict" situation. *In re Air Crash Disaster Near Chicago, Ill.,* 644 F.2d 594, 605 (7th Cir.1981). To dispose of the first three contentions this Court need only resort to fundamental principles of contract construction entrenched in both states' jurisprudence. And the last two theories involve straightforward application of the relevant UCC provisions adopted in both jurisdictions.

**16.** Ironically, both sides claim Section IV(6) is *unambiguous*—then they proceed to give it diametrically opposite readings. That itself is a fair indication of its ambiguity.

**17.** As familiar tenets of contract construction also teach, parol evidence as to the parties' intent can be considered when the contractual language is murky. Even were Michigan Pow-

er its draftsman, the available parol evidence is far too inconclusive (and conflicting) to warrant summary judgment in Schwartz's favor.

**18.** *Builders Windows, Inc. v. Ceco Steel Products Corp.,* 274 F.2d 311, 313–14 (7th Cir.1960), a pre-UCC case, used similar reasoning in rejecting a claimed breach of an implied warranty of fitness by the seller-manufacturer of windows that did not satisfy the Federal Housing Administration's minimum requirements. Though the contract in *Builders Windows* did not mention those federal requirements (in contrast to the Agreement's express reference to UL listing), the Court of Appeals' discussion could easily have been written for the present case:

Nowhere in the contract is there any specification or requirement regarding the type of product which Ceco [the seller] was to manufacture. The agreement was that Builders [the purchaser] would sell Ceco's product. Builders does not suggest there was any defect in material or workmanship in Ceco's windows. Basically, the claim is that if

2. Even were Schwartz's resale objective treated as the relevant "purpose," there is a disputed fact issue as to the System's fitness for that purpose—whether Michigan Power's inability to obtain UL listing substantially impaired the System's marketability in the Chicago territory.

3. Schwartz and Michigan Power themselves negated any implied warranty that the Systems sold to Schwartz (in their unmodified state) were of sufficient quality to receive UL certification. Section IV(6) expressly recognized the possibility of modifying the System to secure UL approval.

4. Arguably Section IV(6)'s disclaimer might not vitiate any implied warranty as to the System's adaptability to UL specifications. But at least one factual issue would defeat summary judgment on that implied warranty theory: whether Schwartz "assumed the risk" of the System's basic incompatibility with UL requirements. *See,* e.g., *Ruggeri v. Minnesota Mining & Manufacturing Co.,* 63 Ill. App.3d 525, 530, 20 Ill.Dec. 467, 470, 380 N.E.2d 445, 448 (5th Dist.1978) (recognizing assumption of risk defense to implied warranty claim).

Schwartz's melange of arguments is without merit.[19] His summary judgment motion on the Complaint counts must be denied.

### *Motion for Summary Judgment on Counterclaim*

As will be recalled, Michigan Power's counterclaim challenges Schwartz's refusal

Ceco's windows had been designed differently, they would have received greater consumer acceptance in the Chicago area. We hold this is not a situation where reliance may be had upon an implied warranty of fitness under the Illinois Sales Act.

19. Schwartz's R.Mem. 7 asserts for the first time Michigan Power breached Section IV(6) by failing to seek UL approval of any other energy management systems marketed by Michigan Power. Again Schwartz has conveniently overlooked critical language. That provision directs Michigan Power to acquire UL certification for "present and future power

to discharge various of his Agreement duties—most notably, to order additional System units. Schwartz now contends Michigan Power's failure to obtain UL listing operated as a contractual breach that relieved him of his own contractual responsibilities. In the summary judgment context that argument must be given short shrift, for it relies on the same arguments found unsuccessful on Schwartz's other summary judgment motion.

### *Conclusion*

At the very least, genuine issues of material fact abound to defeat Schwartz's motions for summary judgment. Both motions are denied.

management systems manufactured by MPM *to be marketed in the Chicago territory.*" Nowhere has Schwartz shown (or alleged) that he ever attempted to market any Michigan Power product other than the System. Indeed Schwartz severed his relationship with Michigan Power within several months of the Agreement's execution—when Michigan Power first encountered difficulties in obtaining UL listing. Schwartz really has no standing to advance his newly asserted contractual claim. Even were that not the case, his argument also falls far short of entitling him to summary judgment.